506 So.2d 1252 (1987)
Shirley McNAMARA, Secretary of the Department of Revenue & Taxation State of Louisiana
v.
STAUFFER CHEMICAL COMPANY.
CITY OF BATON ROUGE and Parish of East Baton Rouge, et al.
v.
STAUFFER CHEMICAL COMPANY.
Nos. 86 CA 0822, 86 CA 0823.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
Rehearing Denied May 11, 1987.
*1253 James C. Russell, Jr., Baton Rouge, for Shirley McNamara, etc.
J. David Bourland, Baton Rouge, for City of Baton Rouge, et al.
Roger Fritchie, Robert Roland, Baton Rouge, for Stauffer Chemical Co.
John Wilson, Richard Anderson, New Orleans, for Texaco, amicus curiae.
John Ward, Jr., Baton Rouge, for E.B.R. School Bd., amicus curiae.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This suit arose from an attempt by the State of Louisiana (State), the City of Baton Rouge, Parish of East Baton Rouge, and East Baton Rouge Parish School Board (City-Parish) to levy a sales tax against Stauffer Chemical Company for its process of regenerating sulfuric acid for its customers. The trial court ruled against Stauffer, finding the service to be taxable. Stauffer timely filed this appeal.
The facts of this case are largely undisputed and may be summarized as follows: Stauffer's plant in East Baton Rouge Parish has manufactured sulfuric acid for sale to industrial users and consumers since the 1940's. It also provides a service for its customers by which it "regenerates" the sulfuric acid. This chemical treatment process consists of removing impurities which get into the acid during the manufacturing processes utilized by Stauffer's customers and of removing water absorbed by the acid during its use, which renders the acid less effective due to dilution.[1] The acid which the customers return to Stauffer for treatment is acid owned by the customers and on which State and City sales taxes were paid at the time of initial purchase.
In the manufacturing processes used by Stauffer's customers and in the processing and regeneration by Stauffer, an approximate five percent (5%) loss of acid by volume occurs. To make up this loss in volume, Stauffer sells new sulfuric acid to the customers which is added to the returned sulfuric acid during the treatment process. Both State and local taxes are paid on this new acid but not on the entire service provided by Stauffer in its regeneration process. It is the cost of providing this service, i.e., the regeneration process, which the plaintiffs seek to tax.
In 1979 the Department of Revenue and Taxation of the State of Louisiana filed suit against Stauffer for sales taxes and interest for the years 1973 through 1975, contending that this regeneration process constituted a "repair" of that acid within the "sale of services" provision of the State Sales Tax Statute, LSA-R.S. 47:301 et seq. During the pendency of this suit, the City-Parish filed a tax rule, asserting a claim for local sales taxes, interest, and penalties for the years 1976 through 1984 pursuant to various local tax ordinances, which in all pertinent respects are the same as the State Sales Tax Statute. Additionally, the City-Parish sought attorney fees in the amount of 10% of the taxes, penalties, and interest determined to be due, pursuant to Section 8(c) of the City-Parish ordinance. The issue raised with respect to taxes due in the tax rule filed by the City-Parish was identical to that raised by the States' claim, i.e., whether Stauffer's regeneration process of sulfuric acid is taxable as a service under the various tax laws at issue. Consequently, the cases were joined for trial.
The trial court rendered judgment in favor of the State in the amount of $641,410.17 and in favor of the City-Parish in the *1254 amount of $6,524,483.49 for delinquent taxes and interest. The City-Parish's additional claim for penalties was denied and the trial judge found the mandatory attorney fee portion of LSA-R.S. 47:1512 and its local counterpart unconstitutional. He found attorney fees of $50,000 to be reasonable under the circumstances and ordered Stauffer to pay this amount.
Stauffer has suspensively appealed both of these judgments specifying the following assignments of error:
1. The Trial Court erred in holding that the regeneration of sulfuric acid by Stauffer constituted a "repair" and this was taxable as a service under R.S. 47:301(14)(g).
2. The Trial Court erred in failing to conclude that the sulfuric acid owned by Stauffer's customers was an immovable by destination (or declaration) and therefore not "tangible personal property."
3. The Trial Court erred in failing to apply the reprocessing exclusion provided by R.S. 47:301(10), to the oleum or fuming sulfuric acid furnished to some of Stauffer's customers, which became a necessary and beneficial part of their final product.
4. The Trial Court erred in allowing taxation of the charges made by Stauffer to Exxon Corporation for unused reserve capacity which involved no regeneration of acid at all.
Prior to the instant appeal, the City of Baton Rouge filed a direct appeal to the Louisiana Supreme Court contesting the district court's ruling that LSA-R.S. 47:1512 and Section 8(c) of the City-Parish ordinance dealing with attorney fees are unconstitutional. In City of Baton Rouge v. Stauffer Chemical Company, 500 So.2d 397 (La.1987), the supreme Court reversed the lower court's ruling and found these provisions to be constitutional. The case was then remanded to us to consider "whether the attorney fees (if owed) as mandated under the laws in question are excessive and unreasonable for the legal services performed and, if so, whether the amount of attorney fees fixed by the trial judge was reasonable under the circumstances." Accordingly, the issue pertaining to attorney fees is properly before us and will be considered in conjunction with the other issues on appeal, as specified in Stauffer's assignments of error.
By its first assignment of error, Stauffer contends that their regeneration process does not constitute a "repair of tangible personal property" within the meaning of LSA-R.S. 47:301(14)(g) and, therefore, is not subject to sales tax.
The key to disposition of this case lies in resolution of whether or not restoration of spent sulfuric acid by Stauffer, on behalf of its customers, constitutes a "repair" and is thus a taxable service. Ancillary thereto is the issue concerning whether or not the reprocessing exclusion provided by R.S. 47:301(10) applies to the oleum or fuming sulfuric acid furnished to some of Stauffer's customers.
Pursuant to Acts 1948, No. 9, the Louisiana Legislature levied a sales tax on specifically enumerated services. This tax is presently found in LSA-R.S. 47:302 C, which provides in part: "There is hereby levied a tax upon all sales of services, as herein defined, ..." (Emphasis added). As the statutory language states, only the services defined in the statute are taxable. Likewise, the rules and regulations promulgated by the Secretary of the Department of Revenue and Taxation for the State of Louisiana, which rules and regulations parallel the comparable sections of Title 47 of the Revised Statutes, clearly states in Reg. Art. 47:301(14) thereof:
The Louisiana Sales Tax Law basically treats the furnishing of services and permission to use certain kinds of property the same as the sale of merchandise, and the law classifies those items as sales of services. Only those services specifically itemized under the provisions of R.S. 47:301(14)(a) through (g) are taxable. (Emphasis added).
LSA-R.S. 47:301(14) enumerates the taxable services and subparagraph (g) thereof contains the language germane to the basic *1255 issue in this case.[2] LSA-R.S. 47:301(14)(g) reads as follows: "(g) [T]he furnishing of repairs to tangible personal property, including by way of illustration and not of limitation, the repair and servicing of automobiles and other vehicles, electrical and mechanical appliances, watches, jewelry, refrigerators, radios, shoes, and office appliances and equipment." (Emphasis added.)
After a careful review of the record, we agree with the holding of the trial court that this regeneration process is taxable under the sales tax statutes in question. We hold that, by whatever semantics, Stauffer was furnishing a service to its customers. To use a colloquialism: You can paint a cow purple and call it a horse, but it is still a cow! (Emphasis supplied.)
Examination of the contracts in the record, between Stauffer and its customers, clearly reflects that the parties consider the service performed by Stauffer a "restoration" of spent sulfuric acid to original usable condition. In fact, the contract between Stauffer and one of its customers, Exxon, U.S.A., states in its preamble the following: "... which has the capacity to restore spent sulfuric acid to original usable condition and to convert commercial sulfur to sulfuric acid; ... Exxon, U.S.A., wishes to have restored to its original usable condition, ...." (Emphasis added.)
In the definitions portions of that same contract, we note under subparagraph (h), the following: "Regenerated Acid shall mean sulfuric acid restored to original usable condition by Stauffer from spent acid delivered to Stauffer by Exxon, U.S.A. hereunder." (Emphasis added.)
Black's Law Dictionary, 5th Edition, defines the word "repair," which appears in both state statute and local ordinance, as the operative verb for construing that taxing provision, as follows: "To mend, remedy, restore, renovate. To restore to a sound or good state after decay, injury, dilapidation, or partial destruction." (Emphasis added.)
The commentary following this definition states: "The word `repair' contemplates an existing structure or thing which has become imperfect, and means to supply in the original existing structure that which is lost or destroyed, and thereby restore it to the condition in which it originally existed, or as near as may be." (Emphasis added.)
Testimony of Dr. Harvey Hurlburt, one of Stauffer's witnesses, concerning the restoration process at its plant, and the process through which the spent sulfuric acid is submitted to accomplish restoration, illumes:
The spent acid is fed into a combustion furnace along with fuel, airand this furnace operates at about 1,800 degrees fahrenheit. At this time all the hydrocarbons are burned as carbon dioxide. All the sulfates are decomposed to sulfur dioxide and oxygen. And the mixed gases then go to a boiler where heat is recovered. After this, they go through a tower where the gas is humidified and then cooled. This is to remove the excess water. The gas is then passed to a drying tower where they are completely freed of water and after this, are mixed with air and sent to a converter system where the sulfur dioxide is oxidized to sulfur trioxide. The sulfur trioxide rich gases are then passed through a tower over which strong sulfuric acid passes and this sulfur trioxide is absorbed in this acid making the acid even stronger. In the meantime the strong acid produced, part of that is product, part of it is recycled back to the drying tower where it relieves the dilution that occurs at that point. The gases then pass on out to the stack. The gases, that is to say, they are not absorbed.
Dr. Hurlburt continued with his testimony, on cross-examination by plaintiff, as follows:

*1256 Q. Would you explain what is done during this heating process?
A. Well, the furnace is fueled with natural gas and the acid is sprayed into the flame. And at this point the hydrocarbonsthere is a hydrocarbon reduction of sulfate to sulfite, or SO4 to SO2 if you like, and this is where the SO2 comes from. All of the sulfate molecules have to be reduced. And this is done by the hydrogen in the fuel. The excess fuel compenents are burned to CO2 and water.
Q.... at that point in time, though, you are not through with the process; are you?
A. No.
Q. The acid in terms of your customers needs and as far as your specification is still not afor lack of a better terma clean acid at that point in time, is it?
A. Well, there is no acid at all at that point. It is just simply a gas mixture.
Q.... in regards to the process by which you then go to rebuild this to a usable product once again, sulfuric acid, at what point in time do youwrong word I am sureenergize it with or add back into it, water?
A. Well, let me explain what happens. We take the gas and we dry it. We get all the water out of it. And then we send it through our converter. We add oxygenwe add air to it first to adjust the oxygen SO2 ratio to make it proper for conversion, and we make sulfur trioxide out of it there. Now, at this point, this point is where you might say we add the water....
Dr. Hurlburt further testified the spent sulfuric acid is submitted to additional treatment, subsequent to the above described process and before the process starts to rebuild the dilution and gases into a usable sulfuric acid. The effect of the process at Stauffer, as testified by Dr. Hurlburt, is that the water is taken out along with all carbonaceous materials, reducing the spent sulfuric acid to sulfur dioxide, prior to its being processed again into a usable sulfuric acid.
Stauffer's witness, Dr. Hurlburt, also testified that the "stripped-down" or "sulfuric acid reduced to sulfur dioxide," is no longer sulfuric acid during its restoration process. In fact, he stated it became nothing more than a mixture of gases and that it is not sulfuric acid at that point in time, after it has been stripped down to its sulfur dioxide level. Correspondingly, the expert witness who testified on behalf of the plaintiff, Dr. Hulen B. Williams, testified in response to the following question on direct examination:
Q. Dr. Williams, if you could step up to the blackboard there. I think there is a piece of chalk there. If you would show to the court basically what you perceive to be the process at Stauffer Chemical Company in regard to their regeneration of sulfuric acid.
A. They have some problems of removing impurities, most of which are burned out, perhaps all essentially are, but they make what they do not entirely parallel to the manufacture of fresh or virgin sulfuric acid. But sulfuric acid, for the most part, is made today, and I'll go quickly because virtually everyone in this room knows how it is made. The SO2 which is then oxidized to SO3 over
THE REPORTER: Would you step on the other side of the board so I can hear you.
A. Sulphur to sulfur dioxide. Then there is a catalyst right here sometimes that is referred to as pentavalent vanadium, meaning vanadium has an oxidation state of five there. And we go to SO3 Now, then, this sulfur trioxide is absorbed reacts with water. I'll talk more about the absorption process in a minute. It doesn't really dissolve in water very readily. That is the principle (sic) reason that the sulfur trioxide in the plant is dissolved in a sulfuric acid solution, the strength of which is raised by dissolving the SO3 in it up, in fact, today as I understand it, to around 99 and a half percent sulfuric acid. But the fact still remains that whether the water is made available to this sulfur trioxide from the weak acid *1257 solution or in some other way, we end up with H2SO4, which is sulfuric acid. But the answer to your specific question what does Stauffer Chemical do and I might say that when I first looked at this situation I believe in 1982 I wasn't entirely sure what Stauffer Chemical did and it has taken a while, I hope, fully understand the process from this point of view. You see, one could just take, you would think, take it back to SO3, but it is not a practical matter to do that. So what Stauffer Chemical does, they take the spent acid solutionnow that solution as I understand it may range from around mid sixties up to oh, low nineties percent, sixty-five, ninety-two, something like that or eighty something in percent sulfuric acid. And they reduce all the sulfuric acid back to SO2 In other words, the reason I went through this general equation of the manufacturing process is to say that they go back and leave out step one. They do not take it back to sulphur, they take it back to sulfur dioxide. And then this sulfur dioxide is reprocessed back to sulfuric acid of a strength acceptable to custom.
Q. Is it fair to say that these molecules are broken and refabricated, or reconstituted, or regenerated, or repaired regenerated, or repaired as we say?
A. This molecule is decomposed and all that is left of that initially is SO2 Now, when it is restored this SO2 is restored back to sulfuric acid. (Underscoring ours.)
Both chemical experts testified without contradiction that the process of purification or restoration of the spent sulfuric acid at Stauffer is so complete that it actually reduces sulfuric acid to a non-acid, or to sulfur dioxide, before the product is restored and considered usable and ready for shipment back to Stauffer's customers. Dr. Williams described, as did Stauffer's Dr. Hurlburt, the process as "decomposing" the sulfuric acid to sulfur dioxide in order to clean and restore it to usable sulfuric acid once again. He also used the word "restored" in his description of the end result of the process to which Stauffer submits the spent sulfuric acid. Although Dr. Williams did not use the word "repair", and testified, quite frankly, that he would not use the word repair as a chemist to describe the process, he did state that he certainly would use the words "to fix it," which he testified as being in his opinion, as a chemist, a little broader than repair. He also testified that the phrase "fix that solution" would mean to him or any other chemist, "restore it to strength." He further testified that although the word "repair" would not be a word he would use in a laboratory to strengthen the solution, he certainly felt it was synonymous with the word "restore" to a chemist. This witness concluded his testimony, under cross-examination, by stating that, in his opinion, it was not incorrect to call the process of restoring spent sulfuric acid at Stauffer a "repair." It would be difficult, based upon the above well accepted and universally available definitions of the word "repair", and the testimony adduced at trial by witnesses of both parties, to conclude other than the restoration of spent sulfuric acid by Stauffer comes well within common usage of the word "repair" and its accepted meaning and understanding. It appears equally clear to us that Stauffer is definitely providing its customers a service as envisioned by the statute and ordinances applicable here. To conclude otherwise would not do justice to the legislative intent to tax services which return property in an unusable state, to a pre-existing usable condition, especially when even the defendant terms its process in its contract as a "restoration," which certainly implies or directs a returning to a prior condition-accomplished by providing a service.
Such is exactly what Stauffer performs for its customers; it restores spent and unusable sulfuric acid to a sound and usable state for continued use by them. Graeme Spring and Brake Service v. De Felice, 98 So.2d 314 (La.App.1957). Further, the process at Stauffer could be akin to that of restoring a discharged battery to a charged state. There is nothing mechanically involved in that process, all a chemical *1258 reaction, as it is completed through restoring the sulfuric acid in the battery to a charged, or usable, original, state, making it suitable for the purpose for which it was designed. The service of recharging a battery is, without question, a taxable incident in Louisiana upon which a sales service tax has always been collected. Likewise, the dry cleaning of clothing, a chemical process, not mechanical, has always been considered a taxable incident for the service provided. Merely because the process by which Stauffer restores spent sulfuric acid to usable sulfuric acid, not being something utilized normally by the retail market, does not make it any less a taxable service of restoring tangible personal property to a pre-existing sound or original state. The process Stauffer subjects the spent sulfuric acid to for restoration is unquestionably more extensive than either of the two above taxable sales services which do nothing more than restore the property to, or as close as possible, their original condition.
In fact, there is no doubt to this court that the sulfuric acid is tangible and personal property, within the meaning of the state sales statute and local taxing ordinance. The question of what constitutes "tangible personal property" is not entirely new to this court. In the matter of Exxon Corp. v. Traigle, 353 So.2d 314 (La. App. 1st Cir.1977), writ denied, 354 So.2d 1385 (La.1978), this court interpreted that phrase, which first appeared in Louisiana in Act 75 of 1936. The terminology "tangible personal property" was used therein and has been consistently used in all later reenactments of the sales tax statute. We found that, although "tangible personal property" is a common law term, we did not believe the legislature intended to import the common law into Louisiana for the purpose of sales tax law, or to require the court to develop a new body of property law for the purpose of sales taxes. And thus, we defined the term in accordance with the general property law of Louisiana, and held that, in accord with Louisiana Supreme Court, "tangible personal property," as used in a taxing statute or ordinance, is the same as "corporeal movable property" as used in the Civil Code. St. John the Baptist Parish School Board v. Marbury-Pattilo Construction Company, Inc., et al, 254 So.2d 607 (La.1971); American Sign and Indicator Corp. v. City of Lake Charles, 320 So.2d 234 (La.App. 3rd Cir.1975). There is no question in this case, as in the before cited matters, the sulfuric acid here is "tangible" property within the definition of Article 471 of the Civil Code which provides: "Corporeal movables are things, whether animate or inanimate, that normally move or can be moved from one place to another."
The record clearly reflects that the sulfuric acid of Stauffer's customers, is, for the most part, in a state of flow, and thus would well come within the import of this codal provision, and as described in the commentary thereto; [The] "[d]efinition of corporeal movables is made, on principle, in accordance with notions of physical mobility." We must then assume that, in this matter, the trial judge was correct in finding the spent sulfuric acid to be tangible personal property as a synonym of corporeal movable property.
Although, it is well established that doubts as to the meaning of terms in taxing statutes are to be resolved in favor of the taxpayer, it is our opinion it was well within the purpose and objective of the legislature for the word "repair" to be given a general and liberal meaning, and not to be construed in a highly limited sense, and that such word clearly encompasses the "restoration of tangible personal property" in a process, or service, which "restores" the thing (spent sulfuric acid) to the condition in which it originally existed (usable sulfuric acid).
As to defendant's contentions of the applicability of LSA-R.S. 47:301(10), the reprocessing exclusion, to the customers of Stauffer, pertaining to oleum or fuming sulfuric acid, it should be pointed out that defendant's own witnesses testified the sulfuric acid, which has been restored by Stauffer and used to transport the oleum, or sulfur trioxide, back and forth from Stauffer to its customers' plants, is nothing more than a "pipeline." Testimony adduced *1259 at the trial clearly showed the sulfuric acid is used to transport the sulfur trioxide to the customer and the sulfuric acid, now in a spent condition, goes back to Stauffer to get another load of sulfur trioxide. In fact, Stauffer's own witnesses testified none of the sulfuric acid ends up on the final product and that it is not to the advantage of the customer for any of it to end up in the final product.
It is well established in Louisiana that in order for the "further processing" exception to sales tax to apply, the materials must be further processed into tangible personal property for sale at retail. Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976); McNamara v. Oilfield Const. Co., Inc., 417 So.2d 1311 (La.App. 3d Cir. 1982), writ denied, 422 So.2d 157 (La.1982). We find defendant's argument urging the oleum exception without merit since the restored sulfuric acid does not form any part of the end product of Stauffer's customers. To the contrary, the use of oleum, or fuming sulfuric acid, merely serves as a transporter of a substance that does become integrated into a final product and which would be within the offered exception.
Pursuant to the Supreme Court's remand in this matter on January 12, 1987, we now address whether the attorney fees fixed by the trial court are excessive and unreasonable for the legal services performed by City-Parish's privately retained counsel.
We note initially that the Supreme Court has upheld the constitutionality of that portion of La.R.S. 47:1512 and its counterpart in the parish sales tax ordinances which mandates that the losing taxpayer pay, as an additional charge, attorney fees of ten percent (10%) of the delinquent principal, interest, and penalties determined to be due, when the taxing authority employs private counsel in its collection. In essence, the Supreme Court held that the additional charge of ten percent (10%) as a penalty for attorney fees is not unconstitutional per se; but, under that court's constitutional authority to regulate the practice of law, a review of the reasonableness of the fee, not to exceed the statutory ten percent (10%), is a matter for judicial scrutiny.
In our review process we are ever mindful that, under jurisprudentially established standards, we should not disturb the findings of the trial court unless we can say the same are manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Considering the inordinate period during which the taxing authorities made no serious effort to collect the taxes involved, coupled with the uncertainty of the applicability of the laws to Stauffer's process, we agree with the trial court that the statutory and/or ordinance penalty for failure to voluntarily pay should not be assessed. Both justice and equity dictate nothing less.
The record submitted to us for review discloses that the trial judge conducted a separate hearing on the issue of attorney fees. At that hearing, while no testimony, expert or otherwise, was offered as to the value of the type of services performed by counsel, the trial judge had the benefit of briefs and arguments on both sides of the issue.
Clearly the issues in this matter have generated legal pyrotechnics consuming many hours of labor and effort by all counsel. Their briefs and argument, both at trial and on the reviewing level, speak eloquently to this fact. Unfortunately we do not have evidence as to value of services upon which to premise a more informed judgment. Based on the record as constituted, we cannot say that the trial court's determination that a fee of $50,000.00 was warranted is unreasonable. To the contrary, the record as a whole, although absent evidence as to value of the services rendered by the taxing authority's private counsel, discloses the fee to be most reasonable and conservative.
For the foregoing reasons, the judgment of the trial court is affirmed at Stauffer's costs. La.C.C.P. art. 2164.
AFFIRMED.
*1260 CRAIN, J., concurs.
SAVOIE, J., dissents and assigns reasons.
SAVOIE, Judge, dissenting.
I respectfully dissent. After a careful review of the record, I cannot agree with the holding of the trial court that this regeneration process is taxable under the sales tax statutes in question. To hold that Stauffer's chemical treatment process is taxable as "repair to tangible personal property" would be in violation of our principles of statutory construction.
The only witness to state that "repair" was a proper word for Stauffer's process was the appellee's expert Dr. Hulan B. Williams. However, Dr. Williams also stated that he would not use the word "repair" to describe Stauffer's process, nor did he know of any other chemist who would use the word "repair" for such a process, and finally, except when speaking of the word itself, Dr. Williams never once used "repair" to describe the process.
LSA-C.C. art. 14 provides that "[t]he words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words." (Emphasis ours). It is also well established that tax laws are to be interpreted liberally in favor of taxpayers and that the words defining things to be taxed should not be extended beyond their clear import. Uncertainty in the language of the statute must be resolved against the government and in favor of the taxpayer. Hibernia National Bank v. Louisiana Tax Commission, 195 La. 43, 196 So. 15 (1940); South Central Bell Telephone Company v. Traigle, 357 So.2d 610 (La.App. 1st Cir. 1978), rev'd on other grounds, 367 So.2d 1143 (La.1978).
Accordingly, the scope of LSA-R.S. 47:301(14)(g) and Section 1(b)(7) of the City-Parish sales tax ordinance may not be extended by implication or by a forced construction beyond the clear import of the language used therein. To call Stauffer's regeneration process a repair would be an unlawful extension of the meaning of the word "repair" and is a forced construction beyond the common sense meaning of that term as used in the taxing statutes.
The ambiguity of the taxing statutes in question is pointed out by the fact that in 1961 and 1968 the State considered taxing Stauffer for its regeneration process. Both times the Department of Revenue and Taxation determined the services to be nontaxable as a "repair" under LSA-R.S. 47:301(14)(g). Also, the trial judge "waived" all penalties for nonpayment apparently because he found Stauffer to be in good faith in its belief that taxes were not owed under the statute.
LSA-C.C. art. 16 provides:
"Where the words of a law are dubious, their meaning may be sought by examining the context with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning."
The examples of "personal tangible property" in the statute describe manufactured consumer goods. Although the statute expressly states that the examples given are only illustrative and not exclusive, the list provides guidance in any determination of the statute's "true meaning." I find no intention by the Louisiana Legislature to treat industrial chemical processes such as Stauffer's regeneration process as a "repair of personal tangible property" even if we strain its interpretation to include such a process. At best I find the statute to be ambiguous under the facts of this case and all doubts and ambiguities are to be construed in favor of the taxpayer. Hibernia National Bank, 196 So. at 18. Thus, I must construe the statute in favor of Stauffer and against the taxing authorities.
The majority uses two analogies in support of its argument. Neither has merit. The first analogy is dry cleaning, but dry cleaning is specifically provided for in LSA-R.S. 47:301(14)(e). The second is recharging a car battery which is also specifically provided for in LSA-R.S. 47:301(14)(g).
*1261 I found helpful the following analogy provided by Texaco, Inc. in its brief as amicus curiae:
The removal of impurities from sulfuric acid during the Stauffer regeneration process and the addition of virgin sulfuric acid, upon which sales tax is paid, during said process is analogous to the services performed by a swimming pool maintenance service. A pool service removes impurities from the pool's water, such as leaves and other debris, and adds chemicals to the water to maintain the chemical content at a desirable level. Thus, such a pool service deals with impurities and dilution and restores the water to a good state. Yet, such a service is not subject to sales tax as a repair or otherwise.
For the above and foregoing reasons I respectfully dissent.
NOTES
[1] Sulfuric Acid (H2SO4) is used as a catalyst by Stauffer's customers to produce certain products. After customer use the sulfuric acid is returned to Stauffer in a diluted condition, contaminated by carbon impurities and is thus unsuitable for customer use. Stauffer runs the "spent" acid through fire and the carbon is burned away in the form of carbon dioxide, CO2 Water content is then removed and kept aside for later reintroduction. After these steps, sulfur dioxide, SO2, a stable gas remains. Air is then introduced at a controlled rate to add oxygen to form sulfur trioxide, SO3, an unstable gas. To make this gas safe for conveyance to Stauffer's customers, the retained water is reintroduced to form or reform sulfuric acid in a more concentrated state. This acid is returned to the customers. Sales tax is paid on the value of the increase in concentration, but not on the entire processing (service) charge.
[2] Pursuant to the authority granted by Art. VI, § 29 of the Louisiana Constitution of 1974 and LSA-R.S. 33:2737, 2738.51 and 2738.66, the Parish of East Baton Rouge and the City of Baton Rouge adopted a sales/use tax. In Section 1 (b)(7) of their sales tax ordinances, definition of furnishing of repairs is in substance identical to that in LSA-R.S. 47:301(14)(g)(i).