821 So.2d 694 (2002)
STOWE-WOODWARD COMPANY (DIVISION OF S.W. INDUSTRIES, INC.), Plaintiff-Appellant
v.
LINCOLN PARISH SCHOOL BOARD, et al., Defendants-Appellants.
No. 36,100-CA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 2002.
Rehearing Denied August 8, 2002.
*695 Oreck, Bradley, Crighton, Adams & Chase by Bruce J. Oreck, Jesse R. Adams, III, Nicole Crighton, New Orleans, for Plaintiff-Appellant S.W. Industries, Inc.
Dawkins & Carter, by William S. Carter, Jr., Ruston, for Defendant-Appellant Lincoln Parish School Board.
Cook, Yancey, King & Galloway by Bernard S. Johnson, Shreveport, Dawkins & Carter by William S. Carter, Jr., Ruston, *696 for Defendants-Appellants Lincoln Parish Police Jury, City of Ruston, Lincoln Parish Sales & Use Tax Commission, Richard Durrett and Jerry W. Moore.
Cook, Yancey, King & Galloway by Bernard S. Johnson, Shreveport, for Defendant-Appellant Dr. Gerald Cobb.
Before WILLIAMS, STEWART and KOSTELKA, JJ.
STEWART, J.
The plaintiff, Stowe-Woodward Company, a division of SW Industries, Inc., (hereinafter "SW"), appeals a judgment of the trial court denying its claim for a refund of sales tax which it paid under protest to the defendants, herein referred to collectively as Lincoln Parish. The trial court found SW's activities, which involve the re-covering of rolls used in the paper-making industry, taxable as repair services and rendered judgment in favor of Lincoln Parish in the amount of $829,099.37, plus interest and attorney fees. However, the trial court ordered Lincoln Parish to refund penalties assessed against SW. Lincoln Parish appeals that portion of the judgment finding no penalties due by SW. For the following reasons, we affirm the trial court's judgment.

FACTS
At a facility located in Lincoln Parish, SW re-covers large metal rolls which are used in the manufacturing of paper. As shown by a schematic drawing of a paper machine introduced into evidence, rolls are used throughout the paper manufacturing process. Each roll has a different application or function. Some uncovered rolls may be used, but those rolls used in areas critical to the process of paper making are covered rolls. SW re-covers covered rolls with elastomeric covers which are custommade to meet the specific needs of individual customers. SW's customers are primarily located outside of Lincoln Parish. Rolls to be re-covered are shipped to SW's facility in Lincoln Parish.
SW's re-covering operations were described and demonstrated in a video introduced into evidence. According to SW's video and testimony presented at trial, elastomeric roll covers are used in paper making to create a uniform pressure zone called the nip, which processes continuous sheets of product under a wide variety of operating conditions. Customers can select cover material from over 100 standard elastomeric and polymer compounds. With the assistance of sales application engineers and research personnel, SW's customers can select the exact materials to allow each covered roll to perform consistently in the specific operating environment of the paper mill. Speed, loading, temperature, thickness, chemical resistance, thermal stability, hardness, and fiber release properties are all considered when selecting cover materials as these all relate to the various tasks performed by covered rolls.
Rolls are transported to SW's facility from paper mills for re-covering. When SW receives a roll from a paper mill, it assigns the roll an identifying number for tracking through the re-covering process. The old cover is removed using a turning lathe, then the roll surface is cleaned. Certain rolls, such as suction press cores, are covered with holes. The holes on these rolls are drilled to clean out any buildup and to store the hole pattern in a computerized drilling machine so that the new cover can be drilled with holes precisely matching those on the roll. An adhesive is then applied to the roll. In the meantime, the appropriate cover material is selected for the roll from among the over 150 different raw materials kept on hand by SW for use in its cover recipes. *697 Up to 15 different compounds may be added to elastomers to achieve compounding properties sought by individual customers. Although a cover may require several hundred pounds of materials, the materials and compound ingredients are mixed in small batches. This allows SW to produce the exact chemical composition required for the specific cover being made. Each batch is tagged with identifying information for tracking through the process. Each batch is mixed using a two-roll open mill which kneads the ingredients until it reaches a soft plastic state. Consistency is achieved by testing samples from each mixed batch. Approved batches are mixed again and then removed from the mixing mill in strips. The strips are then treated with a release material to prevent sticking. After the strips have dried, they are taken to an extruder where they are heated and formed to a consistent thickness. The strips are then wrapped around the prepared roll in a continuous ribbon and pressed into place by a pressure-activated roller. The newly re-covered roll is then wrapped in a special cloth and placed in a vulcanizer for curing through computer-controlled heat and high pressure. These conditions cause a chemical reaction between the elastomer and other ingredients which changes the material from a soft, malleable texture to a rigid elastic state. The strips melt into a single unit and form a bonded layer over the roll body. The covered roll is then treated with a turning lathe, and the ends are trimmed to match the roll body. Finally, the roll is placed in a precision grinding machine which finishes the surface to the specified diameter, length, surface type, and crown profile. An additional drilling step may be required on certain rolls, such as suction press and dry press rolls, whose covers need holes to match those on the roll body. The newly covered rolls are inspected, cleaned, wrapped, and shipped back to customers.
At issue in this appeal are sales taxes paid under protest by SW in response to assessments by Lincoln Parish in 1995 and 1996 for the tax period of January 1, 1991 through December 31, 1993. After conducting an audit in 1994, Lincoln Parish assessed sales tax upon concluding that the re-covering of covered rolls was a repair and therefore taxable as a sale of services under the applicable parish ordinances and state statutes. The parties entered a stipulation at trial setting forth the amounts at issue including the taxes, penalties, and interest which totaled $1,454,321.72.
As stated by the trial judge in his reasons for judgment, the sole issue to be decided was "whether the process of permanently bonding certain elastomeric covers to large metal rolls is a taxable service." SW's argument in seeking reimbursement was that its operations are not subject to sales tax because it is a manufacturer of covers which are sold and delivered to customers outside Lincoln Parish. This argument is based on laws prohibiting the collection of sales tax on the sale of goods or tangible property delivered outside the territorial limits of the taxing parish or municipality and the levying of taxes on tangible personal property produced or manufactured in Lincoln Parish for export. See La. R.S. 33:2716(A) and 47:305(E); L.P. Ordinance Sections 3.02 and 3.03.[1]
*698 The trial court rejected SW's argument and concluded that SW's re-covering operations are repair services subject to taxation in Lincoln Parish. This conclusion was based on factual findings that use of a bare roll is not feasible in the paper making industry, that the covered roll is one unit, and that the cover must be removed and replaced once it becomes worn or damaged. The trial court's ruling was also based on the laws pertaining to sales tax regulation and opinions addressing taxation of comparable processes. Noted by the trial court as similar and persuasive was a policy memorandum issued by the Louisiana Department of Revenue which states re-coating, re-wrapping, and re-galvanizing of previously coated, wrapped, and galvanized pipe to be a taxable service. However, the trial court did rule in favor of SW by ordering reimbursement of the penalties assessed by Lincoln Parish. Based on the trial court's written reasons, judgment was rendered in favor of Lincoln Parish in the amount of $829,099.27 in taxes together with $417,947.50 in interest, along with attorney fees in the amount of $143,289.43. The judgment further ordered a refund by Lincoln Parish to SW of penalties in the amount of $207,274.84.
SW argues on appeal that the trial court erred in defining its operations as repair services, in failing to conclude that it is a manufacturer, in admitting and relying on the policy memorandum, and in awarding interest and attorney fees above the fifteen percent burden permitted under La. R.S. 33:2746. In answer to SW's appeal, Lincoln Parish argues that the trial court erred in concluding that penalties were not due by SW.

DISCUSSION

Taxation of SW's Re-Covering Operations
The principal issue before us is the taxability of SW's operations by Lincoln Parish. Analysis of this issue first requires an examination of the pertinent provisions of the applicable tax laws. It is well settled that the tax statutes are to be liberally interpreted in favor of the taxpayer. Uncertainty in statutory language must be resolved against the taxing authority and in favor of the taxpayer. Clyde Juneau Company, Inc. v. Caddo-Shreveport Sales and Use Tax Commission, 28,433 (La.App.2d Cir.6/26/96), 677 So.2d 610; Intracoastal Pipe Service Co., Inc. v. Assumption Parish Sales and Use Tax Department, 558 So.2d 1296 (La.App. 1st Cir.1990), writ granted in part, denied in part, 563 So.2d 863 (La.1990).
Authorization for Lincoln Parish to levy sales tax is set forth in La. Const. Art. 6, § 29(A), which provides in pertinent part as follows:
(A) Sales Tax Authorized. Except as otherwise authorized ..., the governing authority of any local governmental subdivision or school board may levy and collect a tax upon the sale at retail, the use, the lease or rental, the consumption, and the storage for use and consumption, of tangible personal property and on sales of services as defined by law....
La. R.S. 47:302 provides for the imposition of a tax upon both "the sale at retail ... of each item or article of tangible personal property, as defined herein" and "all sales of services, as herein defined." Likewise, L.P. Ordinance Section 2.01 levies "a tax upon the sale at retail, the use, ... of tangible personal property and upon the sale of services...." Definitions for the terms sale, sales of services, and tangible personal property are provided in La. R.S. 47:301 as follows, in pertinent part:
(12) "Sale" means any transfer of title or possession, or both, ... of tangible personal property, for consideration.... *699 (14) "Sales of services" means and includes the following:
(g)(i) The furnishing of repairs to tangible personal property, including but not restricted to the repair and servicing of automobiles and other vehicles, electrical and mechanical appliances and equipment, watches, jewelry refrigerators, radios, shoes, and office appliances and equipment.
(16) "Tangible personal property" means and includes personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses.
These terms are defined in the same way in the relevant parish ordinances. Pursuant to these provisions, SW's operations in Lincoln Parish may be subject to taxation if such operations either constitute sales of tangible personal property or sales of services, meaning repairs to tangible personal property.
In short, SW's argument is that it is a manufacturer of elastomeric covers, an item of tangible personal property, which it sells to its customers. The covers are applied to the customer's rolls as part of the sale. Sales price is defined as the "total amount for which tangible personal property is sold, excluding the amount charged for labor or services rendered in installing, applying, remodeling, or repairing property sold." La. R.S. 47:301(13)(a). SW argues that its application of the cover to the customer's roll does not convert its sale of the cover into a sale of services because the definition of sales price contemplates that a sale of tangible personal property may require installation of the property for the customer. SW further argues that the covers sold during the relevant time period were delivered to customers outside of Lincoln Parish. Both La. R.S. 33:2716 and L.P. Ordinance Section 3.03 prohibit the levying of sales tax on the sale of tangible personal property delivered or service performed outside the territorial limits of the taxing parish. Moreover, both La. R.S. 47:305(E) and L.P. Ordinance Section 3.02 prohibit the levying of a tax on tangible personal property produced or manufactured for export. Because the covers sold by SW were delivered to customers outside of Lincoln Parish, possibly including customers in other countries, SW contends that Lincoln Parish is prohibited from levying a tax on these sales of tangible personal property.
SW's argument is based on a view of its operations in the most simplistic terms and is not persuasive when the totality and complexity of SW's operations are examined. The record establishes that SW's operations involve much more than simply manufacturing covers which are sold and shipped to customers outside of Lincoln Parish. While a large component of SW's operations involves the manufacture of the cover material, the essence of SW's operations is the provision of a service to its customers, namely the re-covering of covered rolls. As can be seen from the recovering process described herein, the manufacture of the custom-made cover material is only a component of the recovering service provided by SW to its customers. What must be determined is whether the service provided by SW to its customers is subject to taxation as sales of services.
A tax on "all sales of services" is levied by La. R.S. 47:302(C) and L.P. Ordinance Section 2.01. Only those services defined by statute are taxable. Intracoastal Pipe Service Co., Inc., supra; McNamara v. Stauffer Chemical Co., 506 So.2d 1252 (La.App. 1st Cir.1987), rehearing denied, writs denied, 512 So.2d 454 and 512 So.2d 455 (La.1987). The particular service germane to our analysis is "the furnishing of repairs to tangible personal *700 property." La. R.S. 47:301(14)(g)(i); L.P. Ordinance Section 1.19(7). The illustration of repair services following the language "the furnishing of repairs to tangible personal property" does not restrict or limit taxable repair services to only those listed in the statute and applicable ordinances. La. R.S. 47:301(14)(g)(i); Parish of Jefferson v. Ekco-Glaco, 280 So.2d 629 (La.App. 4th Cir.1973). Repair, however, is not defined by the statute or tax ordinances.
Our Civil Code instructs that "words of a law must be given their generally prevailing meaning." La. C.C. art. 11. In addition, words and phrases are to be read in context and construed according to common usage. La. R.S. 1:3. Jurisprudence has also sought to define repair as used in the context of tax law by its generally prevailing meaning and common usage. South Central Bell Telephone Co. v. Barthelemy, 94-0499 (La.10/17/94), 643 So.2d 1240. Webster's College Dictionary defines "repair" as "to restore to a good or sound condition after decay or damage; mend." Similarly, the definition of "repair" in Black's Law Dictionary is "to mend, remedy, restore, renovate. To restore to a sound or good state after decay, injury, dilapidation, or partial destruction."
In South Central Bell Telephone Co. v. Barthelemy, supra, maintenance services consisting of technical support, updating, enhancing and reformatting of software were not found to fall under "repair services" for tax purposes. The court concluded that the services were not provided to "fix" broken software but were done to enhance operable software so it would perform as efficiently as possible. Cleaning services to remove corrosion and accumulated rust and dirt from pipes used in the oil and gas industry were also not found to be repair services for tax purposes in Intracoastal Pipe Service Co., supra. The cleaning services did not in any way fix anything that was broken and did not change the substance or condition of the pipe tubing.
However, the service of straightening, repairing, and glazing of baking pans performed by Eko-Glaco in Jefferson Parish for baking businesses in Louisiana and other states was found to be a taxable service under La. R.S. 47:301(14) and the applicable parish ordinances. Parish of Jefferson v. Eko-Glaco, supra. In McNamara v. Stauffer Chemical Co., supra, the chemical treatment process of regenerating or restoring spent sulfuric acid was found to be a repair service because the process restored the acid to a sound and usable state.
Like the services at issue in the preceding two cases mentioned, the re-covering service provided by SW for its customers is a repair of tangible personal property for tax purposes. The trial court found that the covered roll is one unit and that the cover must be removed and replaced when it becomes worn or damaged. Moreover, the trial court found that use of the bare roll is not feasible in the paper making industry. These factual findings are supported by the record.
Joseph M. Genco, a chemical engineering professor and director of the University of Maine Pulp and Paper Pilot Plant, testified as an expert in the paper making process on behalf of SW. Genco opined that the roll body and the cover are two separate and distinct products. He testified that covers are replaced to improve function or production. However, he stated the most common reasons for replacement to be damage, fatigue, or wear which ends the useful life of the cover. Genco testified that many rolls could be used without covers in the paper making process; but, he admitted that the machine would not run as efficiently and that covers are critical in certain processes, such *701 as coating. On cross examination, Genco admitted that he found no literature to support his opinion that the roll and cover are distinct items. In addition, Genco admitted that he had never been involved in selecting a cover or determining when to replace a cover and that he was not familiar with either the cost of covers and rolls or the expected life of covered rolls. He also stated that "a good fraction" of rolls critical to the paper making process are covered or should be covered. He agreed that the cover cannot exist unless it is bonded to the roll, and he listed the parts of a "covered roll" when asked to do so by defense counsel. Genco also agreed that a worn cover will not function properly or performed as designed to do so and that replacement of the worn cover would restore the covered roll to a properly functioning condition.
William Summer Butterfield, SW's vice president of research, testified about the re-covering process and the various properties that covers can impart during the paper making process. Butterfield candidly testified that a roll could operate during paper making without a cover, but that without a covered roll in use for critical applications, both production and quality would suffer. He stated three reasons wear, damage, and production enhancement why paper makers have rolls recovered. However, at his deposition, he gave only two reasons-damage and the end of the cover's useful life.
Robert L. Hinkle, an SW plant manager, also testified on behalf of SW. Hinkle testified that SW does not repair the roll or work on the roll body. He also testified that the rubber strips produced by SW are useless without a roll on which to apply the strips and admitted that the cover has no use apart from its application to the roll.
Lincoln Parish presented the testimony of John Hay Heitmann, Jr., a professor in the wood and paper science department at North Carolina State University, who was accepted as an expert in paper making technology, paper sciences, and paper mill operations. It was Heitmann's opinion that a paper making machine could not be run without covered rolls due to damage that would occur to the sheets. Heitmann did not know of any paper machine operating without elastomeric covers on rolls in at least some applications. He specifically mentioned that a large number of rolls critical to the paper making process are covered and that covered rolls are essential to paper making. Heitmann agreed that a covered roll is a functioning unit of a paper machine. He explained that the cover is an integral part of the covered roll because it is permanently attached to the roll and because the roll cannot function as intended without the cover. Heitmann stated this to be the commonly held view of covered rolls at mills at which he had worked. The body, internals such as vacuum or cooling systems, the elastomeric cover, bearings, and journals were described as the parts of a covered roll by Heitmann as well as Genco. According to Heitmann, a cover is replaced when it is damaged or when it has worn out over time. Heitmann testified that he had never encountered a situation where a roll cover was replaced simply to improve production, efficiency, or speed. He agreed that once a covered roll can no longer be subject to grinding, it is no longer able to perform its function, and that replacement of the cover restores a covered roll to a properly functioning and useful condition. He described the replacement of a covered roll as a repair because the re-covering repairs the unit of property, namely the roll.
The preponderance of the testimony supports the conclusion that the covered roll is one unit and that re-covering of the *702 roll is a repair of the covered roll. Each cover is custom-made for a specific roll; however, the cover has no independent existence or value apart from the roll. The cover is made from a manufactured material that is applied to the roll body in strips which form the cover during the vulcanization process. The essence of SW's operations is the provision of the repair service of re-covering covered rolls for customers. It is this service and not merely the cover material produced by SW that has value for SW's customers. Although SW may view its operations as the manufacture and sale of elastomeric covers, evidence in the record in the form of two purchase orders from customers of SW indicates that the customers view the re-covering as a repair. Without the recovering service, neither the cover material nor the bare roll would be of use to SW's customers.
Covered rolls are essential to critical areas of the paper making process. While it may be theoretically possible to use rolls without covers, it is not practical. The testimony established the impracticality of replacing covers simply to enhance production and efficiency. Rather, re-covering of covered rolls takes place out of necessity due to wear or damage which ends the useful life of the cover. This is what distinguishes this service from the maintenance service provided in South Central Bell v. Barthelemy, supra, which merely enhanced the software in order to increase efficiency and improve performance. Enhancement considerations are taken into account when re-covering becomes necessary due to wear or damage. Without the cover, the covered roll cannot function as intended. Re-covering restores the covered roll to a good or sound condition or state allowing it to perform its intended function in the paper making process. This fits precisely within the generally prevailing and commonly used definition of repair. Accordingly, we must conclude that SW repairs tangible personal property by re-covering covered rolls and that such repairs which occur in Lincoln Parish are properly taxable as sales of services.[2] We find that there was no error in the trial court's denial of SW's request for a refund of sales tax paid under protest.

Penalties and Attorney Fees
SW argues that the trial court erred in awarding attorney fees and interest in excess of the of the 15 % total interest penalty allowable under R.S. 33:2746. In answer to SW's appeal, Lincoln Parish argues that the trial court erred in finding no penalties due and ordering a refund thereof.
Addressing the penalty issue raised by Lincoln Parish, we find no error in the trial court's ruling. The parties stipulated the following:
The penalties assessed by Lincoln Parish were assessed as a matter of course pursuant to the applicable Lincoln Parish sales tax ordinances and not based upon any affirmative acts of Stowe-Woodward or any of its representatives, employees or agents.
The parties further stipulated that SW had filed all sales and use tax returns with the appropriate taxing authorities since beginning its operations in Lincoln Parish, that *703 SW had never attempted to hide its operations or prevent audits to determine the correct amount of taxes due, and that SW had "cooperated fully in the audit that is at issue in the litigation." In its reasons for judgment, the trial court noted that whether taxes were owed for SW's operations was a res nova issue and that SW should not be penalized for its good faith interpretation of the law. The trial court also noted that SW had not attempted to avoid payment of tax and had tendered payment "under protest."
Considering the parties' stipulations and the factors noted by the trial court, we cannot say that the trial court erred in concluding that no penalties are due by SW. Uncertainty as to whether SW's operations were properly taxable required litigation to resolve the matter. Under the facts of this case, both equity and the good faith of SW weigh against the imposition of penalties. Moreover, jurisprudence supports a good faith exception to the imposition of penalties. See BP Oil Company v. Plaquemines Parish Government, 93-1109 (La.9/6/94), 651 So.2d 1322; St. Pierre's Fabrication & Welding, Inc. v. McNamara, 495 So.2d 1295 (La.1986); McNamara v. Stauffer Chemical Co., supra.
As to SW's argument regarding the award of attorney fees, we find that the award is supported by the record and by law. SW's argument is based on Elevating Boats, Inc., v. St. Bernard Parish, XXXX-XXXX (La.9/5/01), 795 So.2d 1153, in which the supreme court held that St. Bernard's combined interest, penalty and attorney fee could not exceed the 15% interest penalty permitted under La. R.S. 33:2746. The trial court had awarded 15% interest in addition to 10% attorney fees. The supreme court concluded that the 15 % interest penalty is the maximum allowable burden on taxpayers for delinquent taxes.
L.P. Ordinance Section 9.03 provides for interest upon the unpaid amount at a rate of 6% per annum and "in the event of suit, attorneys' fees at the rate of ten percent (10%) of the aggregate of tax, interest and penalty." Interestingly, state law also provides for attorney fees in addition to the interest penalty set forth in La. R.S. 33:2746. The attorney fees provision is set forth in La. R.S. 47:1512 as follows:
The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Subtitle, or to represent him in any proceeding under this Sub-title. If any taxes, penalties, or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor.
This provision was not addressed by the court in Elevating Boats, but clearly it provides for the award of attorney fees in addition to the interest penalty set forth in La. R.S. 33:2746, which makes no mention of attorney fees. Moreover, La. R.S. 47:1512 provides for attorney fees whether incurred in a collection case or in defense of a taxpayer's suit for a refund. South Central Bell Tel. Co. v. Traigle, 367 So.2d 1143 (La.1978); United Companies Printing Co. v. City of Baton Rouge, 569 So.2d 186 (La.App. 1st Cir.1990), writ denied, 572 So.2d 73 (La.1991); Lake Charles Memorial Hospital v. Parish of Calcasieu, 98-519 (La.App. 3d Cir.12/9/98), 728 So.2d 454, writ denied, 99-0071 (La.3/12/99), 739 So.2d 213. The award of attorney fees by the trial court is permissible under La. R.S. 47:1512.
In addition, the parties stipulated as to Lincoln Parish's entitlement to attorney *704 fees of 10% under La. R.S. 47:1512 and L.P. Ordinance Section 9.3, this amount being $143,289.43 or 10% of the aggregate amount of taxes and interest. The parties also stipulated that this fee was reasonable and not excessive for the legal services performed by counsel on behalf of Lincoln Parish.
Based on the authorization for the collection of attorney fees in La. R.S. 47:1512 and the parties' stipulation regarding attorney fees, we find no error in the trial court's award of attorney fees in addition to interest on the tax found due.

CONCLUSION
In accordance with the reasons expressed, we affirm the trial court's judgment at appellant's cost.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, GASKINS, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] The record includes a copy of the tax ordinance promulgated by the Lincoln Parish School Board, a defendant herein. The parties stipulated that this ordinance is representative of and in substance identical to other applicable Lincoln Parish sales and use tax ordinances relative to these proceedings. Hereinafter, all cited ordinances will be referred to as L.P. Ordinance with the appropriate section number.
[2] SW also challenged on appeal the admissibility of a policy and procedure memorandum issued by the Louisiana Department of Revenue pertaining to its consideration of re-coating, re-wrapping, and re-galvanizing of pipe as taxable repair service. Because this memorandum does not address the specific facts at issue here and because there is ample evidence, other than the memorandum, in the record to support the finding that re-covering of covered rolls is a repair of tangible personal property, we need not address this evidentiary issue to resolve this matter.