FREDERICKA HOMBERG WICKER, Judge.
 

 |2In this appeal, Dean Williamson challenges his conviction of unauthorized use of a movable and the four-year sentence that was imposed pursuant to his conviction. For the reasons that follow, we find no merit to the arguments raised by defendant herein, and accordingly, we affirm his conviction and sentence.
 

 On August 24, 2007, the Attorney General for the State of Louisiana filed a bill of information in St. James Parish, charging defendant, Dean Williamson, with unauthorized use of a movable having a value in excess of $1,000.00, in violation of LSA-R.S. 14:68. At the September 26, 2007 arraignment, defendant pled not guilty. On April 23 and 24, 2009, the matter proceeded to trial before a six-person jury, which found defendant guilty as charged.
 

 Following his conviction, defendant filed a motion for post verdict judgment of acquittal, which was denied by the trial court on September 21, 2009. Thereafter, on September 23, 2009, the trial court sentenced defendant to four years imprisonment at hard labor. Defendant now appeals.
 

 J¿FACTS
 

 Daniel Louque, Sr. has two companies in St. James Parish: Quality Machine Works, which was his original company started in 1985, and Quality Machine Manufacturing, which was a sister company started in 1999. Mr. Louque’s son, Daniel Louque, Jr., heads the administration for both companies and is owner and president of Quality Machine Manufacturing.
 
 [1]
 

 As Mr. Louque, Sr. explained at trial, he formed his machine part repair and manufacture business in 1985 after working as a machinist in local plants for about twenty years. Initially, he set up one business, Quality Machine Works, which was a one-man operation. All of Mr. Louque, Sr.’s work required, and still requires, drawings of the machine parts being worked on or manufactured. When he first opened Quality Machine Works, Mr. Louque, Sr. had no drawings available. In those early
 
 *159
 
 days when a customer called him, he took a pad to the plant and painstakingly prepared the drawings himself. Mr. Louque, Sr. explained that accurate drawings were essential to him performing quality work and that only by turning out a quality product could he keep and grow his business. Mr. Louque, Sr. testified that he carefully saved every drawing he made so that he would not have to repeat the time consuming drawing process each time he made or repaired a part. This was important so that he could more quickly fill his customers’ orders and therefore grow his business. As Mr. Louque, Sr. explained, twelve to fifteen companies formed his customer base, and he had 200 to 500 drawings for each of those customers. Before the business became computerized, Mr. Louque, Sr. placed every drawing in a separate folder for each customer and would put each customer’s name on the top of the folder. He then placed the folders in a binder and stored them in file cabinets. These drawings were company property.
 

 |4In the late 1980’s, Mr. Louque, Sr.’s son, Daniel, joined him in the business. Eventually, in the early 1990’s, Daniel undertook the complex task of computerizing and technologically modernizing the company. To accomplish that end, Daniel hired some consultants to help him select the best software and other server type systems that would allow him to run his business efficiently on a daily basis and, at the same time, protect the integrity of the company files.
 

 A key component of the company’s modernization was the installation of a drawing software system. Daniel installed Auto-CAD. Daniel explained that AutoCAD is a piece of software that allows an engineer or draftsman to put the physical paper sketches of the parts into electronic versions that could be maintained and stored on the computer. This software actually converted the drawings into computer files, which were then printed for the actual repair or manufacture work. Daniel further explained that although the drawings could be printed, the paper was just a duplicate picture; the actual file was needed to do any modifications. Instead of file cabinets, these completed and validated electronic drawings were stored within the computer system. Daniel invested in a software program called Document Loea-ter, which is basically a document management program. In addition to storing the computer files, this software program maintained the integrity of the drawings and allowed the company to create an avenue for customers to view their repair reports.
 

 In order to protect these electronic drawings, it was necessary to employ security measures. Daniel explained that a user name and password were required to access the system and further the company kept track of who accessed the files. Daniel regularly monitored the computer activity and would generate reports that showed the activity of the repositories. In normal circumstances, Daniel would run lfithis report and view it on the computer screen. He explained that such a report was generally about two pages and would cover a six month span of computer activity-
 

 According to Daniel, the job of building the computerized drawings and database was slow and painstaking. It took years to accumulate all of the validated drawings contained in the AutoCAD data base. As Daniel explained, while none of the Auto-CAD files were copyrighted, trademarked, or registered as confidential and protected, they were clearly company property and contained the company logo.
 

 Dean Williamson was Daniel’s lifelong friend. He was best man at Daniel’s wed
 
 *160
 
 ding. After Daniel joined the business, he convinced his father to hire Dean Williamson. Thinking the two friends would play around on the job, Mr. Louque, Sr. was reticent. However, he eventually acquiesced. Dean Williamson came into the company as an apprentice, first learning machinist and millwright skills. Dean Williamson stayed with the company for thirteen years, over time ascending into a manager position. As both Mr. Louque, Sr. and Daniel testified, even as a manager Dean Williamson had nothing to do with the drawings and was at no time an Auto-CAD operator. In September of 2003, Dean Williamson resigned from the company, telling Daniel that he wanted to pursue other ventures and was opening up a business.
 

 After Dean Williamson left the company, Daniel noticed that Quality Machine Works and Quality Machine Manufacturing were losing substantial business from clients such as Cargill and Bayou Steel. While both Cargill and Bayou Steel had been good customers, after Dean Williamson left, Quality Machine’s Cargill and Bayou Steel business dropped basically to zero. Fearing that there had been a breach of integrity in the computer system, Daniel generated a report showing computer activity. Instead of the usual two-page report, it was a | fi200-page report showing an excessive amount of files had been opened over a short period of time. Daniel explained that the report showed the exact drawings that were opened and accessed. This type of report, which Daniel routinely generated, gave a log of the actual transaction each time a file was opened. It documented each line on each file that was opened, and it showed the date the file was accessed, the file name, and the employee who accessed the files. Daniel further explained that a person cannot mass open or copy all of the drawings at one time. This report showed that Courtney Heft, an IT employee who left the company six days after Dean Williamson’s resignation, had accessed and opened in excess of 15,000 files from September 5, 2003, until September 15, 2003. Daniel testified that as an IT employee, Courtney Heft had access to the AutoCAD files, but it was not her daily function to access these files. After generating this report of computer activity, Daniel suspected that Dean Williamson had stolen the drawings and used them to steal the companies’ customers.
 

 Thereafter, Daniel contacted the St. James Sheriffs Office to report what he thought was a crime. The sheriffs office referred him to the State Attorney General. Daniel provided the investigators at the Attorney General’s Office with a copy of the report showing the files that were accessed, the date and time they were accessed, and the individual who accessed them. In addition, Daniel provided the investigators with a report showing the accumulated cost analysis on each of the drawings.
 
 [2]
 

 
 *161
 
 After Daniel made his report to the Louisiana Attorney General, Ricky Murphy, an investigator in that office, undertook the case investigation. When Mr. |7Murphy interviewed Dean Williamson, defendant told him that he had been approached by a business client of Mr. Lou-que, Sr., who said that the Louques’ business was not adequately servicing his company; however, he refused to name the company. Dean Williamson claimed to have “picked up” the client because it was unsatisfied. Dean Williamson also told Mr. Murphy that he had about 60 Au-toCAD drawings that he had engineered for clientele in doing service work for the companies; however, he refused to produce these drawings when requested. When talking to Mr. Murphy, Dean Williamson denied taking any AutoCAD drawings or files from Quality Machine Works or Quality Machine Manufacturers, although he admitted that when cleaning out his desk he possibly could have mistakenly picked up one or two. Mr. Murphy agreed that during the investigation he was not able to verify that Dean Williamson ever used a Quality drawing “to replicate, prepare or give anything to a party.”
 

 Attorney General investigators also executed search warrants on both defendant’s home and business. Three computers were seized from defendant’s business and another was seized from his residence. From these computers, Geoff Miehelli, a forensic examiner in the Attorney General’s Office, extracted information about which he testified at trial. In connection with his examination of the computers, he generated a link file report to look for evidence of AutoCAD drawings in the computers and anything residing in the computers to show that the drawings had been on the computers. Mr. Miehelli explained that a link file report is “nothing more than a pointer to a file somewhere else.” When a person clicks on the link file, it directs the computer to a different location on the computer, such as CD ROMS, to open up the file. His examination in this case revealed many link files that pointed to AutoCAD drawings that were found on the computers. He explained that the link files pointed to files that originated from a CD ROM and he |8was able to see which files were accessed from the same CD ROM based on the serial numbers. Three AutoCAD files were found during the examination of the computer seized from defendant’s home address. These AutoCAD files had been accessed via CD ROM, which was written or burned on September 8, 200S.
 
 [3]
 

 Courtney Heft, the former Quality Machine Works employee who left the company six days after Dean Williamson left, confirmed at trial the she copied the Auto-CAD files for defendant. According to Ms. Heft, in September of 2003, Dean Williamson, whom she considered a supervisor, asked her to copy some files of drawings from the computer to disks. She recalled that Dean Williamson verbally gave her the names of the customers whose files he wanted copied. She believed that it was possibly over 1,000 files, and it took her about ten days to copy all of them. When each disk was completed, she wrote the client’s name on the disk, put it in a case, and gave it to Dean Williamson either personally or left it on his desk. She guessed that there were maybe 20 to 30 disks and said Dean Williamson gave her $100.00 “for getting it done.” Over a year after she left Quality,
 
 *162
 
 Ms. Heft went to work for Dean Williamson in his business. While working there, she saw between 20 and 30 disks in his office, and she knew they were the same disks she had copied for Dean Williamson because she recognized her handwriting on them. She also recalled defendant asking her to locate a drawing for him and she recognized the drawing when she gave it to him. Ms. Heft acknowledged that before Dean Williamson’s request at Quality to copy the files, she had never downloaded from AutoCAD to a disk, but had moved the files from one server location to another.
 

 Defense counsel called several witnesses to testify at trial on Dean Williamson’s behalf. Joseph Bienvenu, defendant’s friend and co-worker at | flQuality Machine Works, explained that as a machinist, he was sometimes required to make drawings, and further he had access to the drawings at Quality Machine Works. Mr. Bienvenu recalled that he never signed an employee’s manual with Quality and did not sign a statement that he would not copy the drawings for his personal use. Although Mr. Bienvenu claimed that he could have copied the drawings if he wanted to, he admitted that he never took the drawings or used them for his personal use because they belonged to the company. With regard to the drawings, he claimed that some of the drawings were other people’s drawings too, and other companies had copies. He also said that at times he received drawings from companies and gave them to Quality to put on file for Quality’s use.
 

 Brandon Poche, another friend of Dean Williamson, testified that as a machinist at Quality, he sometimes had to make his own drawing and maybe did three or four original drawings a year. He estimated that he completed 20 or 30 drawings over the six years he was there. He explained that the drawings were kept in binders in the QC room as well as in AutoCAD files, and anyone who needed the drawings had access to the QC room. However, he recognized that the drawings and files belonged to Quality. Mr. Poche did not recall signing an employee manual at Quality or being told that he could not copy or use the drawings for his own personal use. Yet, he admitted that he never used the drawings for his own personal use. Mr. Poche denied coming across a Quality drawing when working for Dean Williamson. Further, he claimed that he had to make many drawings when he worked for Williamson’s company and also recalled that Dean Williamson had received drawings from other companies.
 

 David Champagne, who is employed by Cargill Grain, testified that he knew Dean Williamson from working with him at Quality Machine Works and still had a working relationship with him after he left Quality and opened his own business. 1 inMr. Champagne claimed that the only job Dean Williamson did for Cargill after leaving Quality was make small pieces for machine parts. With regard to this task, Mr. Champagne explained that either he made the drawings, or they were so simple that he gave Dean Williamson the measurements over the phone or emailed him a hand drawing. When working with Dean Williamson, Mr. Champagne never saw a file with Quality’s name on it. Furthermore, Mr. Champagne continued to give Quality work at the same time he was working with Dean Williamson. Quality did the more complicated work on the larger shafts while Dean Williamson did the simpler jobs. With regard to specifications on parts, Mr. Champagne explained that he could get design specifications on parts from manufacturers if needed and that some specifications were readily available on the open market. Mr. Champagne acknowledged the importance
 
 *163
 
 of the drawings in this type of business and admitted that “you don’t give your competitors drawings.” He opined that “Danny” had probably acquired drawings throughout the years, and that some were probably from when he was a millwright at Cargill. Further, Mr. Champagne had requested some drawings from Quality because he believed if Cargill paid for the part to be rebuilt, then it was Cargill’s property, especially when a cost was added for making the drawing. However, Quality was reluctant to give him the drawings of the parts.
 

 Glenn Madere of Shell Chemical Company also had dealings with Dean Williamson when he was employed with Quality. At trial, Mr. Madere recalled that Quality had done about 50 drawings for Dow Chemical, who had an on-site plant at Shell, and he believed the drawings belonged to Dow Chemical because they paid for them. Mr. Madere knew that Quality kept a copy of the drawings, which were not copyrighted or trademarked in any way. As most other witnesses, Mr. Madere recognized the importance of the drawings and admitted that, although |nhe had access to the Dow Chemical drawings, he would not give them out without asking permission from Dow.
 

 After hearing the testimony of the State and defense witnesses as set forth herein, the jury found Dean Williamson guilty of unauthorized use of a movable having a value in excess of $1,000.00.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 In his first assignment of error, defendant contends that the trial court erred in denying his motion for post verdict judgment of acquittal because the State failed to prove two essential elements of the crime of unauthorized use of a movable. Defendant first contends that the State failed to prove that an actual taking occurred and argues second that data on a computer is not a “movable.”
 

 The question of sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal.
 
 See
 
 LSA-C.Cr.P. art. 821;
 
 State v. Hampton,
 
 98-0381, p. 12 (La.4/23/99), 750 So.2d 867, 880 ceri.
 
 denied,
 
 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999);
 
 State v. Bazley,
 
 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7,
 
 writ denied,
 
 2011-0282 (La.6/17/11), 63 So.3d 1039. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. LSA-C.Cr.P. art. 821(B).
 

 The constitutional standard for testing the sufficiency of the evidence, as enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 See State v. Ortiz,
 
 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998);
 
 State v. Bailey,
 
 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875[12So.2d 949, 954-55,
 
 writ denied,
 
 04-1605 (La.11/15/04), 887 So.2d 476,
 
 cert. denied,
 
 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 State v. Harrell,
 
 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 In the present case, defendant was convicted of unauthorized use of a movable in violation of LSA-R.S. 14:68, which provides the following:
 

 
 *164
 
 Unauthorized use of a movable is the intentional taking or use of a movable which belongs to another, either without the other’s consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently. The fact that the movable so taken or used may be classified as an immovable, according to the law pertaining to civil matters, is immaterial.
 

 A person commits the crime of unauthorized use of a movable when he either takes or uses another’s property without the owner’s consent or by means of fraudulent practices. Although the State is not required to prove that the defendant acted with intent to deprive the owner permanently of his property, LSA-R.S. 14:68 must reasonably be construed to require the existence of fraudulent intent. The State may produce direct or circumstantial evidence of fraudulent intent in unauthorized use cases. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. Though intent is a question of fact, it may be inferred from the circumstances of the transaction.
 
 State v. Anderson,
 
 07-752, p. 6 (La.App. 5 Cir. 2/6/08), 979 So.2d 566, 570.
 

 On appeal, defendant first argues that the State failed to prove that there was an actual taking. Defendant asserts that LSA-R.S. 14:68 requires that the State prove that the defendant had an intent to at least temporarily deprive the victim of a movable. He argues that since there was no evidence that Quality was ever denied | ^access to the data that was taken off the computer, the State failed to prove the element of a “taking.”
 

 In making this argument, defendant ignores the fact that LSA-R.S. 14:68 allows for either a taking or use of the property. Under the circumstances of this case, without regard to whether a taking occurred, we find that the evidence presented by the State at trial sufficiently proved that the computer files were intentionally used without consent and by fraudulent conduct. Defendant had the files copied just prior to his leaving the company to start his new business. Courtney Heft, the employee who copied the files for him on CD ROMS, later went to work with him and observed the CDs with her handwriting on them at his office. She also recalled defendant asking her to locate a drawing for him and she recognized the drawing when she gave it to him. Further, link file reports showed that some of the drawings that were for Quality were opened on defendant’s computers. Given these circumstances, we find that the State proved that defendant had the fraudulent intent to use these files to start up his own business and obtain clients for that business.
 

 We now briefly turn to defendant’s argument that LSA-R.S. 14:68 requires proof that the owner was deprived of the movable, even if only temporarily. While LSA-R.S. 14:68 does not require proof that a defendant had the intent to deprive the other of the movable permanently, it is silent as to whether a temporary deprivation is an essential element of the offense. Regardless, we find that the State sufficiently proved that there was an intent to deprive the owners of the property in this case by using their files. Testimony presented at trial provided that Quality had files for each of their clients and that these files included numerous drawings. These drawings served as an opportunity to obtain business as well as a means to maintain business from their clientele. The evidence presented at trial 114showed that the owner of the computer files was not denied access to the files and their access was not interrupted in any way by the
 
 *165
 
 copying of the files onto the CD ROMS or by defendant taking the CD ROMS to his home and business. However, access to the files means nothing if Quality was deprived of the benefit of the files if defendant used the files to lure clients from Quality. Thus, Quality was deprived at least temporarily of the opportunity to use the files to obtain business, at the time when defendant was trying to use the same files for the same purpose.
 

 Accordingly, we find that the State sufficiently proved that an intentional taking or use occurred “either without the owner’s consent, or by means of fraudulent conduct, practices, or representations, ...” As such, we find no error in the trial court’s denial of defendant’s motion for post verdict judgment of acquittal based on his argument that no “taking” occurred because the owner was never deprived of the property.
 

 The second prong of defendant’s sufficiency argument is that the State failed to prove that defendant took a “movable.” He contends that the data copied from the computer was not a movable because it was not a tangible object but rather was intellectual property as contemplated by LSA-R.S. 14:73.1 et seq.
 

 Movables are defined in the Civil Code in very general terms. The Civil Code defines movables in LSA-C.C. art. 475 by declaring that “[a]ll things, corporeal or incorporeal, that the law does not consider as immovable, are movables.” LSA-C.C. art. 461 distinguishes between corporeals and incorporeals:
 

 Corporeals are things that have a body, whether animate or inanimate, and can be felt or touched.
 

 Incorporeals are things that have no body, but are comprehended by the understanding, such as the rights of inheritance, servitudes, obligations, and right of intellectual property.
 

 LSA-C.C. art. 471 further defines corporeal movables as “things, whether animate or inanimate, that normally move or can be moved from one place to | ^another.” LSA-C.C. art. 473 defines incorporeal movables as “[rjights, obligations, and actions that apply to a movable thing ... Movables of this kind are such as bonds, annuities, and interests or shares in entities possessing juridical personality.”
 

 In
 
 South Central Bell Telephone Co. v. Barthelemy,
 
 94-0499 (La.10/17/94), 643 So.2d 1240, the Louisiana Supreme Court was called upon to decide whether certain computer software constituted “tangible personal property” taxable under the sales and use tax imposed by the City of New Orleans. The Court recognized that the term “tangible personal property” was synonymous with corporeal movable property as used in the Louisiana Civil Code, and then determined that the computer software in the case was “tangible personal property” subject to municipal sales and use tax. In that case, the court recognized the following: “[t]he purchaser of computer software neither desires nor receives mere knowledge, but rather receives a certain arrangement of matter that will make his or her computer perform a desired function. This arrangement of matter, physically recorded on some tangible medium, constitutes a corporeal body.”
 
 Id.
 
 at 1244, 1246, 1250. The court also suggested that the software could be transferred to various media such as from tape to disk and did not take away from the fact that the software was ultimately recorded and stored in physical form upon a physical object.
 
 Id.
 
 at 1246-47. The court concluded that “once the ‘information’ or ‘knowledge’ is transformed into physical existence and recorded in physical form, it is corporeal property.”
 
 Id.
 
 at 1250.
 

 In this case, Courtney Heft inserted CD ROMS into computer hardware and
 
 *166
 
 thereafter applied the appropriate programs to locate and open the desired files of the computer drawings of parts which were stored on the companies’ computer system. After accessing and opening the files that defendant told her he wanted, 11fiMs. Heft then copied the files that contained the desired drawings onto CD ROMS and gave the CD ROMS to defendant, who moved the CD ROMS from Mr. Louque, Sr.’s business to his own home and office. Using the corporeal body of a CD ROM allowed the AutoCAD files to be in movable form. Given these circumstances, we find that the AutoCAD files which were transferred from the software onto CD ROMS are movables within the meaning of LSA-R.S. 14:68. Thus, we find no error in the trial court’s denial of defendant’s motion for post verdict judgment of acquittal based on the argument that the AutoCAD files were not movables.
 

 In light of the foregoing discussion and viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found beyond a reasonable doubt that defendant committed the offense of unauthorized use of a movable. Accordingly, the arguments raised by defendant in this assigned error are without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 In his second assigned error, defendant argues that the jury instructions were incorrect as a matter of law as the instructions failed to fully advise the jury of the applicable law as it relates to the unauthorized use of a movable statute. Specifically, defendant argues “that the defendant ... used computer files ...” was a wrong statement of the law, and that the trial court should have included his requested charge that the offense was with “the intent to deprive the owner of the movable, even if only temporarily.”
 

 LSA-C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under LSA-C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. Failure to give a requested 117jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right.
 
 State v. Thomas,
 
 10-220, p. 13 (La.App. 5 Cir. 11/9/10), 54 So.3d 678, 686,
 
 writs denied,
 
 2010-2758 (La.4/25/11), 62 So.3d 89 and 2010-2752 (La.5/20/11), 63 So.3d 974.
 

 In the present case, the trial court, in instructing the jury, followed the wording of the statute as well as the model jury charge. Further, the Louisiana Civil Law Treatise includes jury instructions for particular crimes and the instruction recommended for this offense is similar to the instruction given in this case. There is no mention of a “temporary” deprivation of property in this recommended instruction.
 
 See
 
 17 La. Civ. L. Treatise, Criminal Jury Instructions § 10:68. The Treatise reflects that “[a]n intent to deprive the other permanently of the movable is not essential.” In fact, the comments explain the following:
 

 As under the prior law, the prosecution need not prove that the offender acted with a specific intent to steal (deprive the other permanent of) the movable. The authors do not feel that the lack of intent to steal (to permanently deprive) is an element of the offense. See La. R.S. 14:5, comments. Thus, the authors recommend that the jury simply be told that the prosecution need not prove an intent to permanently deprive.
 

 
 *167
 
 Based on the foregoing discussion, we find that the trial court did not err in refusing to include the proposed intent instruction regarding a temporary deprivation in the taking element as requested by defendant. Further, although the jury was not instructed as to defendant’s argument of a temporary deprivation, the jury at least heard this argument in closing arguments. It is noted that during closing arguments, defendant did argue that the State had to prove that defendant took the disk with the downloaded drawings even if the intent was to deprive use only momentarily. He explained that the crime would be theft if the intention was |1sto deprive permanently. Defendant also argued that the State brought the wrong charge against defendant.
 

 Accordingly, based on the foregoing discussion, we find no merit to defendant’s argument regarding improper jury instructions.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 

 In his third assigned error, defendant contends that the trial court failed to set forth his reasons for sentencing him to approximately the maximum sentence as a first felony offender. He argues that the judge failed to comply with LSA-C.Cr.P. art. 894.1, and in particular, failed to consider his personal history, employment, and age. He requests that his sentence be vacated and the matter remanded for re-sentencing in accordance with LSA-C.Cr.P. art. 894.1.
 

 In the present case, the record reflects that defendant did not make a timely oral or written motion to reconsider sentence pursuant to LSA-C.Cr.P. art. 881.1. The failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence only for constitutional excessiveness.
 
 State v. Ragas,
 
 07-8, p. 10 (La.App. 5 Cir. 5/15/07), 960 So.2d 266, 272,
 
 writ denied,
 
 07-1440 (La.1/7/08), 978 So.2d 732,
 
 cert. denied,
 
 555 U.S. 834, 129 S.Ct. 55, 172 L.Ed.2d 56 (2008).
 

 However, even if defendant had properly preserved the issue regarding the trial court’s alleged non-compliance with LSA-C.Cr.P. art. 894.1, we find no merit to his argument. At the sentencing hearing on September 23, 2009, the trial court noted that defendant was a 40-year-old male who is officially classified as a first felony offender. The judge stated that he reviewed the PSI, that he considered the numerous letters asking for leniency, and that he considered the recommendation of the Department of Public Safety and Corrections that defendant be sentenced to five years. The trial court also recited defendant’s criminal history including some Impending charges and noted that some charges had been nolle prossed. The court also considered that defendant had admitted to experimenting with illegal drugs in the past. After thoroughly considering the PSI, the letters on defendant’s behalf, and the facts of the case, the trial court sentenced defendant to four years imprisonment at hard labor. Thus, the record clearly shows that the trial court gave reasons for the sentence and carefully considered the PSI report in determining the appropriate sentence for defendant.
 

 As part of this assignment, defendant also claims that he was prevented from raising the issue of excessiveness of sentence on appeal due to the fact that the PSI was not attached to the reasons for sentence. This claim likewise has no merit. At the sentencing hearing, it was clear that defense counsel had access to the PSI and had gone over it with defendant.
 
 *168
 
 Moreover, we customarily consider the constitutional excessiveness of a sentence when a defendant fails to file a motion to reconsider sentence as is the case here.
 

 The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 State v. Warmack,
 
 07-311, p. 7 (La.App. 5 Cir. 11/27/07), 973 So.2d 104, 109. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice. The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed.
 
 Id.,
 
 07-311 at 7-8, 973 So.2d at 109.
 

 laJn considering whether the sentencing court abused its discretion, the reviewing court should consider: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.
 
 State v. Pearson,
 
 07-332, pp. 15-16 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing.
 
 State v. Williams,
 
 03-3514, p. 14 (La.12/13/04), 893 So.2d 7,16. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.
 
 Warmack,
 
 07-311 at 8, 973 So.2d at 109.
 

 As previously noted, the trial court carefully considered the PSI report and gave sufficient reasons for the sentence imposed. In addition to those reasons given by the trial court, we further note that defendant did not receive the maximum sentence of five years and did not receive the potential fine of $5,000.00. In addition, the record reflects that defendant had worked for Quality for a while, had learned his skill from the job, and was trusted. Further, defendant was Daniel’s best friend and best man in his wedding. It appears that defendant involved another employee to facilitate the commission of this offense. This employee considered defendant a supervisor and did as she was told, and according to her testimony, she was not aware that he was about to leave the company. Finally, although the bill of information charged defendant with the taking or use of one to 48 files, it appears that some files consisted of numerous drawings. Defendant was not charged with a separate count for each file or drawing copied in this matter.
 

 Although no case with similar facts was found, we find that, under the circumstances in this case, the sentence imposed on defendant was not excessive. 121 Accordingly, we find that the trial court did not abuse its discretion in sentencing defendant to imprisonment at hard labor for four years.
 

 ERROR PATENT DISCUSSION
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.
 

 For the reasons set forth herein, we affirm defendant’s conviction and sentence.
 

 AFFIRMED
 

 [1]
 

 . For purposes of this opinion, the father will be referred to as Mr. Louque, Sr. and the son will be referred to as Daniel.
 

 [2]
 

 . At trial, Daniel showed the jury a copy of an AutoCAD drawing of a nose sprocket, with a drawing number of 800.036A. He explained that the drawing, which was for a Cargill product, had the company name, Quality Machine Works, to mark ownership as the creator. Each drawing was also assigned a particular number. The first part of the drawing number identified itself with a customer, and the remaining numbers identified the drawings for that company, in sequential order. Daniel explained, "for Cargill the 800 number was used every time and then we would count sequentially on the last three numbers.” Daniel testified that the total cost for the nose sprocket drawing was $1,140.00. The last time this particular file was accessed was by Courtney Heft. A stipulation was offered regarding 19 more of the AutoCAD drawings that corresponded with files shown on the report to have been accessed by Courtney Heft.
 

 [3]
 

 . It is noted that one of the link files involved was the Quality nose sprocket drawing discussed in footnote 2.